# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO. 3:07CV14-H

| | |
|---|---|
| FRESENIUS MEDICAL CARE HOLDINGS, INC. d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA a/k/a FRESENIUS, a New York Corporation, and BIO-MEDICAL APPLICATIONS OF NORTH CAROLINA, INC. d/b/a BMA OF MONROE f/k/a FMC OF MONROE, | |
| Plaintiffs, | **MEMORANDUM AND ORDER** |
| v. | |
| BROOKS FOOD GROUP, INC., and BROOKS FOOD GROUP, INC. EMPLOYEE BENEFIT PLAN, | |
| Defendants. | |

**THIS MATTER** is before the Court on the "Defendants' Cross-Motion for Summary Judgment" (document #46) and the "Plaintiffs' Motion for Summary Judgment" (document #49), both filed March 21, 2008; and the parties' accompanying briefs and exhibits. (See documents ## 47, 48, 50-57).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these Motions are now ripe for determination.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Plaintiffs' Motion for Summary Judgment and <u>grant</u> the Defendants' Motion for Summary Judgment, as discussed below.

## I. PROCEDURAL AND FACTUAL BACKGROUND

This is an action for payment of medical services provided by the Plaintiffs to a participant in the Defendants' employee benefit plan. The Plaintiffs seek, as the patient's assignees, benefit payments pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001.

Clarence Kirkpatrick was employed by Defendant Brooks Food Group, Inc. and participated in the Defendant Brooks Food Group, Inc. Employee Benefit Plan ("the Plan"). His spouse, Margaret Kirkpatrick, also participated in the Plan, and it is her medical treatment at a kidney dialysis center, BMA of Monroe [North Carolina], from May 27, 2003 to March 13, 2007 which is the subject of this action. The dialysis center where Mrs. Kirkpatrick received treatment was owned by Plaintiff Bio-Medical Applications of North Carolina, Inc., which in turn is a subsidiary of Fresenius Medical Care Holdings, Inc. Until February 1, 2006, when Mrs. Kirkpatrick qualified for primary Medicare coverage, the Plan was her primary insurer and Medicare was responsible for secondary payment of her medical expenses.

The undersigned has previously determined that two assignments executed by Mrs. Kirkpatrick, who is now deceased, are valid and that the Plaintiffs have standing as her assignees to enforce her remaining rights, if any, to reimbursement under the terms of the Plan. See "Memorandum and Order" dated August 28, 2007, at 3-5, 7-10 (document #32) (granting Defendants' Motion to Dismiss as to breach of fiduciary duty and Medicare Secondary Payer Act claims, denying as to payment of benefits claim, and reserving issues of sufficiency of evidence and lifetime cap on benefits for consideration at summary judgment).

The Plan documents provide that payable medical benefits are limited to the "usual and

reasonable charges" incurred for a covered service.  A "usual and reasonable charge" is "a charge that is not higher than the usual charge made by the provider of the care or supply and does not exceed the usual charge made by most providers of like service in the same area."  The Plan reimburses the lesser of the usual and reasonable charge or the actual charge billed for the covered services. The Plan also provided that a participant's lifetime benefits were capped at $1 million (one million dollars).

As Plan Administrator, Defendant Brooks had "discretionary authority to decide whether a charge is usual and reasonable" which it did by:

> (i) taking into account the nature and severity of the condition being treated and the presence of medical complications or unusual circumstances that require more time, skill or experience; (ii) considering the amounts allowed by Medicare for each service; (iii) considering the average wholesale price (AWP) for medications as published by Thomson PDR (Red Book); and (iv) periodically when such marketplace information is available, considering payments that providers accept from other networks for their services and payments that other providers who provide similar services accept.

Although Brooks possessed final authority on coverage decisions, the Defendants retained a third party administrator to serve as "Plan Supervisor" to oversee the Plan's day-to-day operations, which included making initial coverage decisions.  From sometime before Mrs. Kirkpatrick began receiving covered dialysis treatments until July 15, 2003, Employee Benefit Services, Inc. ("EBS") served as the Plan Supervisor.   On July 16, 2003, Brooks changed to another Plan Supervisor, Piedmont Community Health Plan ("PCHP").

The parties agree that "this case presents a simple question of Plan interpretation." See "Defendants' Memorandum in Support ..." at 1 (document #47) and Plaintiffs' "Memorandum in Opposition ..." at 1 (document #52).   More specifically, the resolution of the Plaintiffs' surviving

claim turns on the question of whether the Defendants abused their discretion in calculating the "usual and reasonable charge" for the dialysis services Mrs. Kirkpatrick received from the Plaintiffs.[1]

For the first six weeks that Mrs. Kirkpatrick received dialysis treatment, that is, from May 27, 2003 through July 15, 2003, the Plaintiffs billed the Defendants through their then-Plan Supervisor EBS. Although the Defendants recognized their obligation to provide dialysis benefits at the "in network" rate, because the Plaintiffs were "out of network" providers there was no preexisting contract between the parties (or between EBS and the Plaintiffs) governing the reimbursement amount for Mrs. Kirkpatrick's dialysis treatments. Thereafter, EBS agreed to approve a reimbursement amount equal to 90% of the Plaintiff's billed charge for Mrs. Kirkpatrick's treatments. There is no indication in the record, however, that EBS based this decision on the "usual and reasonable charge" for the services Mrs. Kirkpatrick received. Rather, this initial arrangement was simply a discount from the Plaintiffs' billed charges.

After becoming Plan Supervisor on July 16, 2003, PCHP attempted to negotiate with the Plaintiffs a contract setting the reimbursement amount for Mrs. Kirkpatrick's dialysis treatments. By letter dated October 22, 2003, PCHP stated its willingness to approve services at Plaintiffs' facility in Monroe, North Carolina "at the network level of benefits," but with Mrs. Kirkpatrick being "responsible for all charges above reasonable and customary." In the same letter and "in an effort to assist [Mrs. Kirkpatrick] with the financial burden of the charges above reasonable and customary," PCHP expressed its willingness "to work with [Plaintiffs] in negotiating a contractual

---

[1] The dialysis center was designated a non-Network facility under the Plan. However, because there was no in-Network facility within one hundred miles of Ms. Kirkpatrick's home, the Plan's terms provided that it would pay the in-Network rate of 85% rather than the non-Network rate of 70% of the treatment. In other words, the Defendants acknowledged that they were obligated to pay 85% of the cost of Mrs. Kirkpatrick's dialysis treatments, and that she, or Medicare, would be responsible for the balance.

4

arrangement for [Mrs. Kirkpatrick]." PCHP made this offer because there were no dialysis services "in-network" within 100 miles of Mrs. Kirkpatrick's North Carolina residence. Although PCHP and the Plaintiffs were able to negotiate a separate contract for twenty-six patients receiving dialysis treatment in Virginia, the Plaintiffs elected not to respond to this offer concerning Mrs. Kirkpatrick.

Hearing nothing from the Plaintiffs or from Mrs. Kirkpatrick, PCHP conducted its own analysis, applied the language from the Plan documents quoted above, and concluded that the "usual and reasonable charges" for Mrs. Kirkpatrick's treatment would be computed as follows:

1. For hemodialysis composite services, 135% of the Medicare allowable rate;

2. For "other ancillary services," 105% of the Medicare allowable rate; and

3. For "other drugs," the "Average Wholesale Price" ("AWP") as published in Thompson PDR ("the Red Book").

In applying the Plan language, the record shows that PCHP considered, among other factors, the following:

1. A comparison of average monthly charges (bills submitted by medical providers) and average monthly charges allowed for other patients receiving similar treatment, particularly the charges and payments for the 26 patients in Virginia. The Defendants contend, and the Plaintiffs do not dispute, that the reimbursement rate PCHP set for Mrs. Kirkpatrick's dialysis treatment was "substantially similar" to the rate the Plaintiffs charged for PCHP's dialysis patients in Virginia, discussed above.[2]

---

[2]Despite the similarity in the services received by Mrs. Kirkpatrick and the dialysis patients in Virginia, the Plaintiff billed at a much higher rate for Mrs. Kirkpatrick's treatment. On average, the Plaintiff billed $78,217.59 per month for Mrs. Kirkpatrick's treatment, while the average monthly billings for the 26 Virginia patients ranged between $8,010.54 and $26,671.07, with a group average of $14,331.

2. The reimbursement rate paid by the national leader in dialysis insurance benefits, Anthem Blue Cross and Blue Shield. It is undisputed that the rate set by PCHP for Mrs. Kirkpatrick's treatment exceeded the rate paid by Anthem.

3. Rates set by Medicare for dialysis treatment, and the Average Wholesale Price for dialysis drugs.

4. A listing of all claims filed by the Plaintiffs and paid by the Defendants.

5. A laboratory fee schedule for Medicare reimbursement in Virginia.

6. Mrs. Kirkpatrick's medical records.

Rather than cite evidence from the administrative record or other evidence that they contend the Defendants reasonably should have considered in setting a higher reimbursement amount, the Plaintiffs rejoin only that the rate set by PCHP was much lower than the rate initially set by EBS, that is, PCHP's calculation of the rate resulted in the Plaintiffs being paid, on average, 13.47% of their billed charges, rather than 90% as allowed by EBS.

In any event, Mrs. Kirkpatrick continued receiving dialysis treatment at the Plaintiffs' Monroe clinic. Claims for payment were submitted to PCHP, which denied Plaintiffs' charges that exceeded the "usual and reasonable charges" discussed above, and explained the denials in "Member Explanation of Benefits" ("EOBs") and "Claims Details" sent to Mrs. Kirkpatrick, and the "Provider Vouchers" sent to the Plaintiffs. The Provider Vouchers specified whenever the "CHARGE AMOUNT [was] REDUCED TO REASONABLE & CUSTOMARY" per the Plan. (Emphasis in original). Moreover, the EOBs and Claims Details likewise advised Mrs. Kirkpatrick whenever the "CHARGE AMOUNT [was] REDUCED TO REASONABLE & CUSTOMARY" per the Plan (emphasis in original) or was not covered by the Plan, clearly identified the "Paid Amount" and the

remaining amount which was "Member Responsibility," and notified her of her appeal rights for an adverse claims determination.

It is undisputed that the Defendants ultimately paid $647,727.87 of Mrs. Kirkpatrick's $1 million maximum lifetime benefit under the Plan.

Mrs. Kirkpatrick never challenged any aspect of the Plan's reimbursement for services she was receiving. Similarly, from October 2003 until June 2005, the Plaintiffs did not contest the Plan's reimbursement for services they provided to Mrs. Kirkpatrick.

On June 16, 2005, Plaintiffs' counsel sent a letter to the Plan, seeking further reimbursement from the Plan for the services Plaintiffs provided to Mrs. Kirkpatrick, that is, seeking payment of all of their billed charges. Other than EBS's decision to initially approve charges at a higher rate, the Plaintiffs did not offer - and do not offer now – any information or evidence that challenged the Defendants' determination of the "usual and reasonable" charge or that demonstrated that their billed charges were the "usual and reasonable" charges for that treatment.

On July 13, 2005, the Defendants responded with a letter explaining, among other things, that to the extent the Plaintiffs were attempting to appeal any earlier reimbursement determinations under the Plan, such an appeal was at least in part untimely; that no information had been provided upon which the Plan could determine that benefits had been paid improperly; that the Plan had agreed to reimburse Plaintiffs (a non-participating provider) at in-network rates; and that the Plan was willing to consider, to the extent permissible under the Plan documents and applicable law, any information the Plaintiffs had demonstrating that the Plan had not paid the usual and reasonable charges for their services.

On January 16, 2006, and after an additional exchange of letters, the Defendants sent a letter

to Plaintiffs' counsel advising that the Plaintiffs' appeal had been denied following an independent review. In other words, after receiving a denial recommendation from PCHP's Utilization Review Committee, Defendant Brooks conducted a de novo review of Plaintiffs' appeal based upon the information contained in the administrative record and determined that the reimbursement paid by the Plan for Plaintiffs' services to Mrs. Kirkpatrick constituted the "usual and reasonable charge" for such services. Based on this determination, Defendant Brooks upheld PCHP's decision (as initially made by PCHP and then confirmed by the recommendation of the Utilization Review Committee) to deny Plaintiffs any further reimbursement from the Plan for the services they had provided to Mrs. Kirkpatrick.

On January 11, 2007, the Plaintiffs filed their Complaint, stating claims for damages for denial of benefits and breach of fiduciary duty, as well as a claim under the Medicare Secondary Payer Act. Despite the relatively limited amount of Mrs. Kirkpatrick's lifetime benefits remaining ($352,272.13 of the $1 million cap), the Plaintiffs contend that regarding their denial of benefits claim, they are entitled to payment of 100% of their billed charges, that is, an additional $1,322,165.25.

As discussed above, on April 28, 2007, the undersigned granted in part and denied in part the Defendants' Motion to Dismiss. See "Memorandum and Order" at 3-5, 7-10 (document #32) (granting Defendants' Motion to Dismiss as to breach of fiduciary duty and Medicare Secondary Payer Act claims, denying as to payment of benefits claim, and reserving issues of sufficiency of evidence and lifetime cap on benefits for consideration at summary judgment).

On December 17, 2007, the Plaintiffs filed a Motion to Compel, seeking production of all documents and other information that PCHP and the Defendants considered in making the

8

determination of the "usual and reasonable charge," both initially and upon administrative appeal, as well as all other documents and information that defined or otherwise related to either the initial determination process or the administrative appeal, regardless of whether the Defendants had incorporated those documents in the formal administrative record.

On January 18, 2008, the undersigned <u>granted</u> the Plaintiffs' Motion to Compel and <u>ordered</u> the Defendants to produce the requested information or before February 18, 2008. <u>See</u> "Memorandum and Order" at 9 (document #45).

On March 21, 2008, the parties filed their respective Motions for Summary Judgment. As discussed above, although the Plaintiffs contend that they are entitled to payment of 100% of their billed charges, they offer no evidence demonstrating that their billed charges were the "usual and reasonable" charges for the type of treatment Mrs. Kirkpatrick received. Instead, the Plaintiffs essentially argue that EBS's decision to approve payment of 90% of the Plaintiffs' billed charges, over the initial six weeks of treatment, is evidence that PCHP's subsequent decision that the "usual and reasonable charges" was the much lower 135% of the Medicare rate, and the Defendants' subsequent review and approval, were erroneous. The Plaintiffs speculate further that the Defendants instructed PCHP to arrive at a lower "usual and reasonable charge" for Mrs. Kirkpatrick's dialysis treatment than had EBS, but concede that there is no evidence of such communication in the record. <u>See</u> "Memorandum in Support of Plaintiffs' Motion for Summary Judgment" at 16 (document #51).

In response, and in addition to the evidence discussed above, the Defendants point out that once Medicare became the primary payer of Mrs. Kirkpatrick's medical expenses on February 1, 2006, the Plaintiffs became "much more circumspect" in their billing practices, although their

9

services to Mrs. Kirkpatrick remained the same. For example, for services rendered in January 2006, the Plaintiffs billed the Plan $98,203.12 for Mrs. Kirkpatrick's treatment and the Plan paid Plaintiffs $13,849.92. The next month, for the same course of treatment, the Plaintiffs billed Medicare $6,872.77 and were paid $1,372.79.

The parties' Motions have been fully briefed and are, therefore, ripe for disposition.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

In reviewing the denial of benefits under ERISA plans, federal courts "apply 'a well-settled framework.'" Stanford v. Continental Casualty Company, 514 F.3d 354, 356 (4th Cir. 2008), quoting Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997).

In Stanford, the Fourth Circuit most recently stated the standard of review in ERISA cases, as follows:

> When the plan at issue grants the administrator discretionary authority to determine eligibility or to construe the terms of the plan, the denial decision must be reviewed for abuse of discretion. Generally, this abuse of discretion standard means that an administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion. Yet, we have often recognized that a conflict of interest exists when a benefit plan is administered and funded by the same party, as is the benefit plan at issue here. The reviewing court must consider this conflict of interest in determining whether the administrator has abused its discretion; in other words, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.
> 
> Nevertheless, precedent in this circuit makes clear that in no case does the court deviate from the abuse of discretion standard. In other words, the reduced deference standard does not require the reviewing court to construe every contract ambiguity in favor of the claimant. To hold otherwise would effectively erase the plan provision granting the administrator discretion to construe plan terms. Instead, where, as here, the plan is administered and funded by the same party, the court

> applies a sliding scale according to which the plan administrator's decision must be more objectively reasonable and supported by more substantial evidence as the incentive for abuse of discretion is shown to increase.

514 F.3d at 356-57 (despite conflict of interest, plan administrator did not abuse discretion in denying benefits) (internal citations omitted). Accord Ellis, 126 F.3d at 232-33 (same); and Doe v. Group Hospitalization & Medical Services, 3 F.3d 80, 87 (4th Cir.1993) (same).

Concerning the Plaintiffs' implicit contention that the presence of a conflict of interest, that is, that Defendant Brooks possessed final discretionary authority and was the payer of benefits, standing alone is proof of an abuse of discretion, the Stanford court stated:

> Importantly, the mere existence of a conflict of interest is insufficient to demonstrate an abuse of discretion. If it were sufficient, a conflicted plan administrator would never be able to make an adverse benefit determination, for a benefit applicant would always be able to have the adverse ruling reversed on appeal. <u>Instead, a plaintiff must produce some evidence indicating that the adverse decision was motivated by the conflict. Such evidence might be intrinsic, such as an internal communication directing the adverse ruling, or it might be extrinsic, such as the fact that other administrators not operating under a conflict of interest had interpreted substantially identical plan provisions in favor of the applicant.</u>

514 F.3d at 357 (internal citations omitted) (emphasis added).

### B. Lifetime Maximum Benefit on Health Insurance Coverage

The record is clear that the subject ERISA plan documents provided a $1 million lifetime maximum health insurance benefit for covered employees and their eligible family members such as Mrs. Kirkpatrick. Moreover, it is undisputed that the Defendants have paid $647,727.87 of Mrs. Kirkpatrick's $1 million maximum lifetime benefit under the Plan, leaving an "available balance" of $352,272.13. The Plaintiffs have not cited, and the undersigned is unaware of, any published authority holding that an ERISA plan administrator abused its discretion when it applied a lifetime,

or other, maximum benefit provision.[3] Accordingly, to the extent that the Plaintiffs seek to recover unpaid health insurance benefits in excess of $352,272.13, their Motion for Summary Judgment will be <u>denied</u> and the Defendants' Cross-Motion for Summary Judgment will be <u>granted</u>.

### C. Usual and Reasonable Charge for Dialysis Treatment

Similarly, and applying the modified abuse of discretion standard set forth above, the Defendants did not abuse their discretion in their determination of the reimbursement rate for Mrs. Kirkpatrick's treatment. Indeed, the record does not contain any type of intrinsic evidence that the Fourth Circuit indicated might be sufficient to establish an abuse of discretion where the plan administrator was also the payer of benefits, that is, "an internal communication directing the adverse ruling." <u>Stanford</u>, 514 F.3d at 357. Instead, the Plaintiffs merely speculate that the Defendants gave such an instruction to PCHP – even though the Court compelled the Defendants to produce such documents or information if they, in fact, existed – but concede that there is no evidence of such a communication in the record. Nor have the Plaintiffs offered extrinsic evidence that the Defendants' conflict of interest influenced the contested decision, such as showing that "other administrators not operating under a conflict of interest had interpreted substantially identical plan provisions in favor of the applicant." <u>Id.</u>

Turning from the issue of the Defendants' conflict of interest to the larger question of whether the Defendants properly utilized their discretion, it is clear on the present record that the

---

[3]While recognizing that unpublished decisions have no precedential value, the undersigned notes that the Fourth Circuit routinely has permitted ERISA plan administrators to enforce lifetime maximums on health insurance benefits. <u>See</u> <u>Meredith v. Mamsi Ins. Resources, Inc.</u>, 2002 WL 1173581, 2 (4th Cir. 2002); <u>Saah v. Contel Corp.</u>, 1992 WL 310225, 3 (4th Cir. 1992); <u>and</u> <u>Baker Hosp. v. Aetna Life Ins. And Cas. Co.</u>, 1991 WL 179113, 2 (4th Cir. 1991) (same). <u>See also</u> <u>Howe v. First Tennessee Nat.</u> Corp., 2007 WL 4233092, 2 (4th Cir. 2007) (no abuse of discretion in enforcing maximum limitation on disability coverage).

Defendants' decision was reasonable and must be upheld. The Plan documents provided that Defendant Brooks had "discretionary authority to decide whether a charge is usual and reasonable" which it did by:

> (I) taking into account the nature and severity of the condition being treated and the presence of medical complications or unusual circumstances that require more time, skill or experience; (ii) considering the amounts allowed by Medicare for each service; (iii) considering the average wholesale price (AWP) for medications as published by Thomson PDR (Red Book); and (iv) periodically when such marketplace information is available, considering payments that providers accept from other networks for their services and payments that other providers who provide similar services accept.

Defendant Brooks first retained EBS, and later PCHP to administer the Plan's day-to-day operations, including making initial coverage decisions. The record shows that PCHP considered a variety of factors, including the treatment, billing, and reimbursement rate for similarly-situated patients, including those receiving essentially the same treatment from the Plaintiffs in Virginia; the rates paid by the industry leader, Anthem, and by Medicare; the average rates charged for dialysis drugs and other "ancillary" treatment; and Mrs. Kirkpatrick's medical records.

Concerning the last factor, other than a passing reference to the fact that Mrs. Kirkpatrick's condition apparently worsened over time – a fact that could be expected to be true of many dialysis patients – the Plaintiffs have wholly ignored the specifics of Mrs. Kirkpatrick's condition and resulting treatment, much less made any showing that her condition necessitated any treatment justifying charges dramatically higher than the Virginia patients. Yet, the Plaintiffs billed, on average, 500% more for Mrs. Kirkpatrick's treatment ($78,217.59 per month) than they did for the Virginia patients ($14,331 per patient per month). Moreover, as discussed above, the Plaintiffs billed the Defendants for Mrs. Kirkpatrick's treatment at a rate more than 10 times higher than the

charges they submitted to Medicare, once that program assumed primary coverage for Mrs. Kirkpatrick. Rather than accept the Plaintiffs' bald assertion that they were entitled to 100% of their billed charges, PCHP instead set a reimbursement charge in line with the charge it had approved and the Plaintiffs had accepted in Virginia and that exceeded the charges paid by both Anthem and Medicare.

When the Defendants reviewed PCHP's decision, which PCHP had already reconsidered through its Utilization Review Committee, they considered the same factors. Notwithstanding the Plaintiffs' unsupported allegation of improper communication between them, the Defendants reasonably affirmed PCHP's initial determination. In light of these considerations and the objective evidence, discussed above, and recognizing the deference that must be extended to the Plan administrator under even a modified abuse of discretion standard, the fact that EBS initially set a higher rate of reimbursement for a brief period of time is insufficient to establish that the Defendants' ultimate decision was unreasonable. Accord Stanford, 514 F.3d at 356-57 (court reduces deference to plan administrator only to extent necessary to "neutralize" conflict of interest, and so long as decision was reasonable and supported by objective evidence, it must be upheld); Ellis, 126 F.3d at 232-33 (same); and Group Hospitalization & Medical Services, 3 F.3d at 87 (same).

In short, the record establishes that the Defendants properly exercised their discretion in determining the rate of reimbursement for Mrs. Kirkpatrick's dialysis treatment. Accordingly, the Plaintiffs' Motion for Summary Judgment will be <u>denied</u> and the Defendants' Cross-Motion for Summary Judgment will be <u>granted</u>.

## III. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. The "Plaintiffs' Motion for Summary Judgment" (document #49) is **DENIED**.

2. The "Defendants' Cross-Motion for Summary Judgment" (document #46) is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE**.

3. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED.**

Signed: June 26, 2008

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge